# PRACTICE REPORTS.

## SUPREME COURT.

KATHARINE WRIGHT *et al.* agt. GEORGE S. WRIGHT, administrator, *et al.*

*Marriage*

Marriage is established by and founded upon *civil contract*. It is not necessary to its validity that it should be solemnized in any particular form, or that the intervention of any priest or magistrate is at all needed to make the contract binding.

All that is necessary for its validity in this state is the deliberate consent of competent parties entering into a present agreement to take each other as man and wife.

This contract may be proved like any other fact, either by positive evidence of the agreement, or by evidence from which it may be inferred.

*Special Term, February,* 1874.

*Abbott Brothers,* for plaintiffs.

*Foster & Thomson,* for defendants.

VAN BRUNT, *J.*—It must be regarded as the settled law in this state that it is not necessary, in order to make a valid marriage, that it should be solemnized in any particular way, or that the intervention of any priest or magistrate is at all needed to make the contract binding.

In this state it is regarded simply as a civil contract, and all that is necessary for its validity is the deliberate consent of competent parties entering into a present agreement to

take each other as man and wife. This contract may be proved, like any other fact, either by positive evidence of the agreement or by evidence from which it may be inferred. It is equally well settled in this state that cohabitation between man and woman, as man and wife, and their being generally known among their friends and acquaintances as such, is evidence from which a marriage may be inferred.

Before we proceed to apply these few general principles to the present case, it will not be amiss to examine the reported cases briefly, and see what kind of cohabitation and reputation has been required in them.

The earliest reported case in our state is that of *Fenton* agt. *Reed* (4 *John. R.*, 52). The question in that case was whether the plaintiff was the widow of one William Reed. The facts of the case were these: In the year 1785 the plaintiff was the lawful wife of John Guest. Some time in that year Guest left the state for foreign parts, and continued absent until some time in the year 1792, and it was reported and generally believed that he had died. The plaintiff, in 1792, married Reed. In that year, and subsequent to the marriage, Guest returned to this state, and continued to reside therein until June, 1800, when he died. He did not object to the connection between plaintiff and Reed, and said that he had no claim upon her, and never disturbed the harmony between them. After the death of Guest, the plaintiff continued to cohabit with Reed until his death, in September, 1806, and sustained a good reputation in society; but no solemnization of marriage was proved to have taken place between the plaintiff and Reed subsequent to the death of Guest. Upon these facts the court held that, as a marriage may be proved, in other cases than in prosecutions for bigamy and criminal connection, from cohabitation, reputation, acknowledgment of the parties, reception in the family, and other circumstances from which a marriage may be inferred, a jury would have been warranted to have inferred an actual marriage after the death of Guest.

The case of *Jackson* agt. *Clair* (18 *John. R.*, 346), the question was: Was the plaintiff the wife of John A. Van Buskirk? and the following were the facts:

In October, 1779, John A. Van Buskirk hired a room at Fishkill for himself and a woman called his wife, and a child named John. The woman's name was Blann, and they both said they were married. They occupied the room until 1780, when Van Buskirk removed, with his family, to New Marlborough, where he remained about a year. In April, 1781, Van Buskirk came back to Fishkill, and said that he and his wife had parted, and that she had gone to Long Island to her friends. Six months afterward, Van Buskirk married the plaintiff, and they lived together as man and wife for a period of nearly forty years. The last heard of the first wife was in 1813, when it was reported that his first wife was living, and was then on her way to Nova Scotia.

The court say that upon the above facts the intercourse between Van Buskirk and Jane Blann might be presumed to be meretricious, but that it was not necessary to place the plaintiff's rights on that ground, as upon the authority of *Fenton* agt. *Reed* (*supra*), there being proved cohabitation for twenty-seven years after the first wife was heard from; also reputation of marriage and a good character in society, very strong presumptions of an actual marriage, after the presumed death of Jane Blann, were established, which were much stronger than in the case of *Fenton* agt. *Reed*.

The next case upon this subject is that of *Rose* agt. *Clark* (8 *Paige*, 573).

Abigail Rose was married to Jonas Frink about 1790, and after living together a short time they separated. Frink married another woman, but returned to this state and died October 24, 1830. Some ten years after Mrs. Rose and her husband, Frink, had parted, she was living with J. Owens, as his housekeeper. She was then married to S. Thruston, who left her next day, and never after claimed her as his wife. She afterward lived with Owens, as his wife, and passed by

his name until his death, in March, 1826. Two or three years after Owens' death she was married to Rose, and they lived and cohabited together until the death of Rose, in January, 1838. Both of them sustained fair characters during that time, and Rose frequently, after the death of Frink, recognized her as his wife. She joined with him, as his wife, in a deed of lands. The children of a prior marriage recognized her as the wife of Rose, and called her mother; and Rose always, in speaking of her to others, called her as his wife.

. The chancellor held that these facts raised a presumption of a marriage between the plaintiff and Rose subsequent to the death of Frink, but he is careful to add to his decision that the mere fact of a man and woman living together and carrying on an illicit intercourse is wholly insufficient to raise a legal presumption of marriage, as it too often happens that such cohabitation takes place when the intercourse between the parties is clearly meretricious. The presumption of marriage only arises from matrimonial cohabitation, where the parties not only live together as husband and wife but hold themselves out to the world as sustaining that honorable relation to each other. And he also adverts to the fact that where the cohabitation is meretricious, that the man frequently attempts to give his mistress a different character from what she in fact sustained toward him.

In the case of *Clayton* agt. *Wardell* (4 *Coms. R.*), the following facts appear:

One Schenk, being the reputed father of a child with which Sarah Maria Young had become pregnant, was, on the 22d of November, 1822, arrested as such putative father, under the provisions of the bastardy act, and entered into the usual recognizance to answer to the charge, and no further proceedings were had thereon. In the early part of May, 1823, Sarah Maria was delivered of a child, which lived about eleven months and then died. After the birth of the child, and while it lived, Schenk, for some part of the time at least, cohabited with Sarah Maria, who lived with her mother. It

was understood among the relatives of Schenk that they were married, and Sarah Maria was received by them as his wife and the child as his child. The relatives of Sarah Maria testified that they never heard her called by any name otherwise than that of Young prior to her subsequent marriage with Messerve, and the connection with Schenk was looked upon by them as disreputable. Very soon after the death of the child, as early at least as the summer following, Schenk ceased to cohabit with Sarah Maria, and in June, 1825, an instrument was executed between them, in which they are described as husband and wife, and by which they mutually agreed to a separation. Sarah Maria Young was, within a month of the time when the articles of separation are alleged to have been executed, married to one Messerve.

The question was whether these facts warranted the legal presumption of a marriage between Schenk and Sarah Maria Young. The court decided that they did not. It is to be observed, however, that the decision was made on a vote of five to four. The grounds upon which the decision was based are : that the commencement of the cohabitation being meretricious it is presumed to continue so until the contrary is shown; that the reputation was divided; also, the legal presumption was relied upon that there is a strong legal presumption against the commission of a crime.

The next case was that of *Canjolle* agt. *Ferrie* (23 *N. Y. R.*, 90), which is particularly relied upon by the plaintiffs.

The question was whether John P. Ferrie was the legitimate or natural son of Jeanne Du Six, by one Valentine Ferrie. The deceased, whose original name was Jeanne Jeaid, was a native of Pau, a city in the south of France, where she was born on the 24th of November, 1777. She was the daughter of John Jeaid and of Magdalen Reviere, people of humble condition, residing at Pau. About the year 1798 Jeanne went to St. Gouris and became a servant of one Anire, a merchant. Here she formed an intimacy with Valentine Ferrie, a tanner, and the next-door neighbor of Anire, the

result of which was that she was likely to become a mother. The father of Valentine objected to his marrying her, as he was desirous of doing, on account of their inequality of social condition, the family of Ferrie being small proprietors, and the friends of Jeanne being poor and herself a domestic servant. Shortly after her confinement she left Anire's for a house in the outskirts of the city. Ferrie abandoned his father, and, in defiance of his authority, went to live with her there, and on the 30th of June, 1800, she gave birth to the defendant. On the 4th of May, 1800, an entry was made in a register of publications of marriage in the archives of mayoralty of St. Gouris, giving notice that Valentine Ferrie and Jeanne Jeaid intended to execute the acts of their marriage on the twentieth of that month. No entry of any civil act of marriage could be found in the archives of the city. Witnesses were examined, who testified that the defendant was called Ferrie in the presence of Valentine, and that Jeanne was called Ferrie by Valentine and by others, and that Valentine and Jeanne lived together as husband and wife.

The court, in considering this evidence, admit that it is a well settled rule that if a cohabitation is illicit at its commencement the presumption of the law is that it so continued, and there must be some circumstance to show that it has been changed. In the case then under consideration the circumstances which indicated the change are given in the opinion of the court in the following language :

It must be assumed that both parents were aware of the necessity of this change. The father, it is clear, not only intended marriage but was most anxious and determined to consummate it. The only difficulty arose from the opposition of his father, and it is quite clear to my mind that he determined to brave that, though it deprived him of a home, the association and friendship of his family, and the disruption of his business relations. His flight from his father's house can only be accounted for on the assumption of his intention to marry Jeanne. Neither his father nor any other member of

Wright agt. Wright.

his family objected to his connection with the respondent's mother as his mistress, but, to secure his marriage with her, flight from his home and estrangement from them were the inevitable necessity and result. These he met for this purpose; and when we see that such estrangement continued, and friendly relations with them were never resumed, can we doubt that he consummated his intention, and that the knowledge of that fact was the cause of the original and continued estrangement and separation from his family? In other words, there being no objection to Jeanne being Valentine's mistress, that he must have abandoned his family only because he made her his wife, and upon this ground the defendant was declared legitimate by a divided court.

The latest case is that of *O'Gara* agt. *Eisenlohr* (38 *New York*, 296), which, in my judgment, puts some restraint upon the tendency which had been particularly apparent in England, that in every case where there is cohabitation and reputation a marriage must be presumed.

The facts were as follows: Patrick Downey was a poor man, living and working in the mines in Pennsylvania from 1833 to 1842. He was married to and lived with a woman named Rose McKone. In 1844, at Bath, New York, he married another woman, the defendant. His wife Rose was then living. The defendant never had heard of his former marriage. Rose was last heard of in 1852, and Downey died in 1856, living with the defendant from that time till his death as his wife. The court held that as the defendant had never heard of the existence of the first wife, that there was no motive for her to urge a remarriage; and as to Downey, he having been convicted, by direct and positive testimony, of criminality, it was to be expected that he would continue his unlawful marital relation with the defendant.

The court say that it is claimed we must presume that Rose Downey died before her husband, and that after her death the defendant and Downey were married, but that presumptions of this kind require to be made with caution; and no

one can look through the adjudged cases on this subject without being convinced that the legitimate limits of presumption have been too frequently overlooked.

There are many cases in the books which cannot be considered as law, and which are condemned by the best commentators; and allusion is made to the fact that in cases of hardship presumptions are indulged in which are manifestly incredible, and that the presuming of absurdities in order to meet a particular case is ever fraught with mischief. The case of *Caylon* agt. *Waddel* is certainly an illustration of this fact. The language of Sir W. D. Evans is also quoted with approbation where he says: "If we once admit the propriety of professing to believe as true what we are actually convinced is not so, nobody can say where the deviation will stop, and legal certainty will be sacrificed at the shrine of judicial discretion."

I have deemed it necessary to make this extended review of the cases in order that we might see what were the principles which have controlled the courts in dealing with cases of this description, and to correct some very erroneous impressions which are current as to the nature of our decision upon this subject.

It would appear that where a man and woman have cohabited as man and wife, have been reputed as such among their friends and acquaintances, and have been recognized as such by each other, a marriage may be presumed. But that it is not every cohabitation from which the presumption can arise but that it must be matrimonial, and if it were illicit in its commencement some facts must be shown that a change has taken place in its character.

In applying these principles to the present case what do we find? Captain Wright's intimacy with Eliza Campbell was undoubtedly illicit in its commencement. The first three children were born during the life of the first wife. The only change which seems to have taken place in their relations to each other, after the death of the first wife, is that Eliza

Campbell, after that event, lived continuously, almost, in the house with Captain Wright. Their intercourse was clandestine; they did not occupy the same room; she was not known generally as Mrs. Wright, if at all. There were only four occasions in the course of sixteen years that she was ever introduced by him, or called Mrs. Wright or his wife. She was known in the household of Captain Wright as Mrs. Campbell. In the purchase of the farm in Dutchess county the plaintiff represented herself as Mrs. Campbell, the widow of John Campbell deceased, when she now swears that she never knew such a man. This representation was made, undoubtedly, to account for the children she had with her. In the Sabbath-school at Throgg's Neck, the children were known as Wright's; but this name applied to all the children of the plaintiff, both those born before the death of the first wife and those born afterward. Captain Wright, in his letters, speaks of the children of the plaintiff, and of the plaintiff herself, in the most affectionate terms, but those terms of affection applied to the earlier born children as well as to the last. He made no distinction.

Could it be possible that the plaintiff, if she knew that her children had the right to the name of their father, would have deliberately entered their births in the Bible, as she did, giving the name of Campbell to them? This was not a record for public inspection, but a private memorandum of her own. The circumstances attending the burial of Humphrey would be very strong standing alone, but when taken in connection with the other circumstances of the case I think they are robbed of much of their significance. It is true the plate upon the coffin was Wright, but the burial certificate was Campbell. The whole of the plaintiff's correspondence with Captain Wright is not such as a wife would write to a husband. I do not refer to individual detached expressions, because that is a very unfair way in which to criticise correspondence, but to the general character of the letters written by her to him. She certainly does not write like one entitled

to share his house and home, entitled to claim, as a matter of right, a support for herself and children, but rather as a dependent—one who has no claim to the support which he gave her,—always addressing him as her dear friend. And it would seem that the children never called him father, but always spoke of him as the "captain." The only instances where there was any evidence that Captain Wright admitted that the plaintiffs had the right to the name of Wright was at the time of the death of Humphrey, and the three or four times that he introduced Eliza Campbell as his wife, or Mrs. Wright; and are not these occasions just within the cases stated by the chancellor in the case of *Rose* agt. *Clark*, where a man frequently attempts to give his mistress a different character from what she in fact sustains toward him? In the same case it is said that the presumption of marriage only arises from matrimonial cohabitation, where the parties not only live together as husband and wife but hold themselves out to the world as holding that honorable relation to each other.

In every case reported in our state, except that of *Canjolle* agt. *Ferrie*, there has been an actual marriage proved, but which was void because of the existence of a prior wife, and also a continuance of cohabitation as man and wife, and a general acknowledgment of this relationship as existing between them for a number of years after the impediment was removed, and the reasoning of the court has been that, as the cohabitation was with a matrimonial intent, evidenced by the prior void marriage, if the cohabitation continued for a number of years after this disability had been removed, we must presume that the parties being aware of the necessity of a remarriage to make their cohabitation legal, that they must have made a new agreement.

In these cases, and also the case of *Canjolle* agt. *Ferrie*, the fact that there was a desire that there should be a legal marriage being indisputably shown, seems to be at the foundation of the presumption that there was a marriage.

Indeed, in the case of *O'Gara* agt. *Eisenlohr*, where the wife of a void marriage did not know of the illegality of her marriage until after the death of her supposed husband, the court say that although they lived together after the disability had been removed, no presumption of marriage could arise because the innocent party had no reason to suppose its necessity.

In the case now under consideration, I have been unable to detect the slightest evidence of matrimonial cohabitation ; no evidence that Captain Wright ever desired to make Eliza Campbell his wife.

The connection was meretricious in its commencement, and no evidence has been offered of any change in its character, except that, subsequent to the death of Mrs. Wright, Eliza Campbell occupied the same house with Captain Wright, not as his wife, but his housekeeper.

There is no evidence of common reputation, indeed the reputation is all to the contrary.

Eliza Campbell was never known as Mrs. Wright ; and, during a period of sixteen years, only four instances have been shown, or attempted to be shown, that he called her his wife or Mrs. Wright.

The connection between Captain Wright and Eliza Campbell was looked upon by his children as disreputable.

As to the treatment of the children, no distinction was made by Captain Wright between those who are confessedly illegitimate and plaintiff's, or his own who lived with him.

Much stress is laid upon the fact that the plaintiff occupied a seat at the head of the table, &c. She would naturally do so if she had charge of the household affairs. She was the only woman in the house who could perform at the table those offices which generally devolve upon the wife, but which, in her absence, are of necessity performed by the housekeeper.

I am aware that the rule is, and rightfully so, that everything is to be presumed in favor of legitimacy; but as long

as the law requires marriage in order to make children legitimate, I do not think courts have the right to perform the ceremony or make the contract of marriage for the parties, where the probabilities all tend to show that the connection has been meretricious.

My sympathies are with the plaintiffs in this case, and if there was the shadow of a doubt in my mind in reference to the fact of this marriage, I would gladly give them the benefit, but I cannot see any difference between the births of the first three children, who are confessedly illegitimate, and the plaintiff's.

The result of a careful examination of the evidence in this case only strengthens the impression which that evidence produced upon my mind at the trial, which is that Captain Wright never did marry Eliza Campbell and never intended to do so.

With this conviction firmly established in my mind, I cannot do otherwise than render judgment for the defendants.